UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

PASQUAL LOZANO,

                     Petitioner,

    v.

ROBERT LEGRAND, et al.,

                     Respondents.

Case No. 3:12-cv-00574-MMD-CLB

ORDER

## I. SUMMARY

This is a habeas corpus action under 28 U.S.C. § 2254. Petitioner Pasqual Lozano seeks relief from his state court conviction for first-degree murder with the use of a deadly weapon and two counts of attempted murder with the use of a deadly weapon. Currently before the Court are the second amended petition for writ of habeas corpus ("Petition") (ECF No. 26), Respondents' answer (ECF No. 55), and Lozano's reply (ECF No. 56). The Court finds that relief is not warranted and denies the Petition.

## II. FACTUAL BACKGROUND

On September 7, 2002, Robert Valentine was walking along the eastern side of Civic Center Drive in North Las Vegas. He stopped to urinate at an apartment building's trash can. A vehicle, later identified as a green Ford Taurus, license plate 766 NMA, drove north on the street. Valentine saw a passenger in the back seat flash a gang sign at him. Valentine responded with a gesture of his own. The Taurus turned around, drove back south, and stopped in the middle of the street near Valentine.

The car had five occupants. Robert Waddell was the driver. Vontrell Davis, Narsha Riles, Darrian Moten, and Lozano were the passengers. Lozano is Hispanic. The rest are African American.

A person holding a gun exited the driver's side rear door of the Taurus, ran toward Valentine, and fired several shots. Valentine ran through the courtyard between two apartment buildings, then behind one of the buildings, and he fled. The shooter did not hit Valentine.

Playing in that yard were several young children. Among them were G.G. and H.G. The shooter did hit them. G.G. died, and H.G. was wounded.

The above facts were not in dispute. At Lozano's second trial,[1] in August and September 2006, the identity of the shooter was disputed.

Valentine said that the shooter was light-skinned. (ECF No. 47-7 at 32.)

Brothers Jonathan and Erick Barrales were in their apartment on the other side of the street. Jonathan heard shots. (ECF No. 47-7 at 89.) He went to a window. He saw a car stopped in the middle of the street, and he saw a person shooting toward the apartments across the street. (*Id.* at 227-28.) The shooter then entered the car through the passenger side, and the car drove away. (*Id.* at 234.) Jonathan said that the shooter was Hispanic. (*Id.* at 228.) Jonathan was not able to identify the shooter in a photographic lineup presented to him in September 2002. (*Id.* at 234.) Jonathan identified Lozano as the shooter in a court proceeding on October 29, 2002, and at Lozano's second trial. (*Id.* at 235-36.)

Erick also heard the shots and went to the window. He saw an African American man fleeing from the shooter. He said that the shooter had "light dark skin," by which he meant that the shooter was Hispanic or Latin. (ECF No. 47-8 at 12.) On cross-examination, Erick insisted that the shooter was not African American, but had skin color similar to his own. (*Id.* at 26.) After the shooter was finished shooting, Erick saw him walk in his direction toward a car in the middle of the street. (*Id.* at 12.) The car, a green Ford Taurus, made a U-turn and drove away. (*Id.* at 13.) Erick was able to read the license plate of the Taurus, 766 NMA, and he gave it to the police. (*Id.* at 20.)

---

[1]As explained below, the trial court granted Lozano's motion for a new trial.

That night, police located the car and detained four people standing near it, including Lozano. (ECF No. 65-1 at 178-200.)[2] A detective brought Erick to that location and showed him those people, one at a time. The third person shown was Lozano. (ECF No. 66-1 at 38-39.) Erick identified Lozano as the shooter. (ECF No. 47-8 at 22-23.) In the second trial, Erick could not identify the shooter as anyone in the courtroom. (*Id.* at 20.) The prosecutor then showed Erick the photographic lineup that police had presented to Jonathan in September 2002. Erick had not seen this photographic lineup before. Erick picked the photograph of Lozano, taken at the time of booking, as the shooter. (*Id.* at 22, 67, 73.)

T.G., the older sister of G.G., and H.G., saw the shooter. Hispanic herself, she testified that the shooter's skin color was lighter than her own. (ECF No. 66-1 at 118.)

Darrian Moten testified at the second trial. He was a hostile witness for the prosecution. Police had interviewed him on October 31, 2002, and he testified at the first trial. His testimony at the second trial led to many of those prior statements being presented to the jury. On September 7, 2002, he was in a car driving along Civic Center Drive. Waddell was driving. Narsha Riles was in the front passenger seat. Moten was in the driver-side rear seat. Vontrell Davis was in the center rear seat. Lozano was in the passenger-side rear seat. (ECF No. 65-1 at 43.) They passed a man on the side of the road. Lozano rolled down the window. The car turned around. The man on the side of the road threw up his hands. (*Id.* at 43-45.) Lozano was holding a handgun. (*Id.* at 123-25.) Moten said that Lozano was holding it in his right hand. (*Id.* at 125-26.) Lozano said, "I want to get at that dude," or "I'm going to get at this dude." Lozano jumped out of the car. (*Id.* at 128-30.) The other man ran behind the garbage bin, and Lozano followed him. The others remained in the car, stopped in the middle of the street. Moten heard shots. (*Id.* at 60-65.) Lozano jumped back into the car, and they left. Lozano said either "I shot him" or "We shot each other, shot at each other." (*Id.* at 129-30.)

---

[2]The trial transcripts in the original exhibits 143 and 145 had continuity errors. The Court's order of October 25, 2019, explains in more detail. (ECF No. 61.)

1    Moten testified that Vontrell Davis was killed some time in 2004. (ECF No. 65-1 at

2    132.) Davis' death occurred after the first trial.

3    The trial court played a redacted recording of the October 31, 2002, police interview

4    of Moten. (ECF No. 66-1 at 49.)

5    Moten's testimony at the second trial was different from his earlier statements. He

6    testified that Lozano was sitting in the front passenger seat, that Vontrell Davis was sitting

7    in the rear passenger-side seat, and that two unidentified men were sitting between him

8    and Davis in the rear of the car. He also testified that Davis, deceased by the time of the

9    second trial, got out of the car and shot at Valentine. He disclaimed his prior statement as

10   the police putting words into his mouth under pressure of criminal prosecution. He

11   disclaimed his prior testimony as lies.

12   Moten also testified for the defense. He said that the interviewing detective would

13   start and stop the recorder until Moten said what the detective wanted him to say. (ECF

14   No. 47-12 at 14-15.) The trial court then instructed the jury that the pauses that they had

15   heard in the recording were stipulated, court-ordered redactions unless the detective had

16   said in the recording that he was starting or stopping the tape. (*Id.* at 15.)

17   Emilio Garcia was an eyewitness who testified for the defense. He heard shots, and

18   he saw an African American man walking from the apartments to a car that was stopped

19   in the street. (*Id.* at 131.) Garcia did not see the shooter from the front, but he saw part of

20   the face, and he saw that the shooter had dreadlocks. (*Id.* at 144.) He admitted that he did

21   not provide the race or ethnicity of the shooter in his written statement. (*Id.* at 146-47.)

22   Carlos Corral also was an eyewitness who testified for the defense. He was with

23   Garcia at the time of the shooting. He saw the shooter from the back, and he said that the

24   shooter was African American. (ECF No. 47-14 at 107.) He based that identification upon

25   the shooter's skin, arms, and head. (*Id.* at 113.) On cross-examination, Corral admitted

26   that he did not provide the race or ethnicity of the shooter in his written statement. (*Id.* at

27   128.) On redirect examination, he maintained that he verbally told a police officer that he

28   had seen an African American man with a gun, but that he did not write it in his statement.

4

1  (*Id.* at 131.)

2    Veronica Partida was an unavailable eyewitness who testified for the defense. Her

3  prior testimony was read into the record. She saw a dark-skinned man, African American,

4  get into the car. (*Id.* at 151-55.)

5    Juane Valentine was Robert Valentine's half-brother and a long-time friend of

6  Lozano. Juane testified that in 2002, he, Robert, and Lozano often would spend time

7  together, drinking and partying. (ECF No. 66-1 at 137-38.)

8    Narsha Riles testified for the defense. His testimony mostly consisted of denials

9  that he had said anything about the shooting to Valentine's stepmother, Tonya Sue Baker.

10  (ECF No. 47-12 at 18-19.)

11    Tonya Sue Baker then testified for the defense. She was the mother of Juane

12  Valentine and the stepmother of Robert Valentine. She related a conversation that Narsha

13  Riles had with her about a month after the shooting, and which Riles had just testified did

14  not happen. According to Baker, Riles said that the shooting occurred very quickly, that

15  he did not know the shooting would happen, that the person in the front passenger seat

16  was the shooter, that Lozano was not the shooter, and that Lozano was as surprised as

17  he was. (ECF No. 47-12 at 33.) Baker also testified that she had a conversation about the

18  shooting with Robert Valentine[3] near the end of 2002. Juane Valentine and Juane's

19  girlfriend also were present. According to her, Robert said that he had recognized Lozano

20  in the car. (*Id.* at 34.) Robert did not know that anyone in the car would pull out a gun and

21  shoot at him. (*Id.*) Robert could not figure out why Lozano was in the car. (*Id.*) Robert saw

22  that the two people in the front of the car were talking, and one was "Rob Lowe," meaning

23  Waddell. (*Id.*) Robert saw the gun come out of the front passenger window. (*Id.*) Robert

24  started to run so quickly that he fell down. (*Id.* at 35.) Robert did not think that Lozano was

25  the shooter, but it all happened very quickly. (*Id.*) Robert was hurt that Lozano was in the

26  car. (*Id.*)

27

28

---

[3]Baker often called Robert Valentine by his nickname, "Chuck B."

5

1    Defense counsel then asked Baker if she ever knew about or saw for herself any

2    conflict between Lozano and Robert Valentine. (ECF No. 47-12 at 37.) She said no. (*Id.*)

3    That question and answer led to the prosecution being allowed to admit rebuttal evidence

4    that Lozano and Valentine were members of rival gangs. Counsel's actions are the subject

5    of part IV of the Petition, discussed *infra* Section V.B.

6    Two psychologists testified as expert witnesses for the defense. Dr. Deborah Davis

7    testified about the reliability of memory in eyewitness identification. (ECF No. 47-12 at 56-

8    119.) Dr. Elizabeth Richitt testified about her observation of T.G.'s testimony. (ECF No.

9    47-14 at 19-34.)

10   Besides the rebuttal testimony on Lozano's gang involvement, other rebuttal

11   testimony came from police officers and detectives who were interviewing people at the

12   location of the shooting and collecting statements. Detective Ewing Melgarejo, who spoke

13   Spanish, interviewed Carlos Corral on September 12, 2002. Corral told him that the people

14   in the car were African American, but Corral did not identify the race or ethnicity of the

15   shooter. (ECF No. 47-16 at 44-45.) Officer Jose Garcia, who spoke Spanish and was part

16   of the investigation at the location of the shooting, did not have any contact with either

17   Garcia or Corral. (*Id.* at 45-46.) Officer Allen Antoniewicz, who did not speak Spanish,

18   handed written statement forms to Jonathan Barrales and Carlos Corral. (*Id.* at 52.) He

19   then collected the forms when they were finished. He had no other conversations with

20   them. In particular, he had no recollection of either of them stating that the shooter was

21   African American. (*Id.* at 52-53.)

22   Every eyewitness who could recall testified that the shooter held the gun in his right

23   hand. Monica Delara, Lozano's sister, testified that Lozano is left-handed. (ECF No. 47-

24   14, at 76.) She also authenticated an old videotape, recorded years before the shooting,

25   that showed Lozano swinging at a pinata with his left hand. (*Id.* at 76-77.) The custodian

26   of records for the Clark County School District brought Lozano's school-nurse records. On

27   January 31, 1990, a nurse evaluated Lozano and noted Lozano's left-hand dominance.

28   (*Id.* at 84-85.) Robert Irwin was a firearms trainer, testifying as an expert witness. He

testified that he requires his students to fire a few rounds using their weak hands. He noted that people are uncomfortable even holding guns in their weak hands, let alone shooting guns and absorbing the recoils. In his experience, people always shoot with their strong hands unless told to shoot with their weak hands. (*Id.* at 95-96.) He did note on cross examination that he never trained Lozano, nor that he had any personal knowledge of which hand Lozano used to shoot. (*Id.* at 96-97.)

Physical evidence also was admitted in the trial. Gunshot residue, which is the heavy-metal residue from a cartridge's primer, was found on the front of Lozano's shirt. (ECF No. 47-8 at 77-78.) Lozano's fingerprints were found on the exterior of the car's passenger-side rear door. (ECF No. 65-1 at 201-10.) A search of the car found a live .357 caliber cartridge and a live 9mm caliber cartridge. (*Id.* at 212-13.) Spent bullets recovered from the location of the shooting which could be measured were either .41 caliber or .44 caliber. (*Id.* at 214.) The gun used in the shooting would not have been able to fire the cartridges found in the car. (*Id.* at 217.)

### III.   PROCEDURAL HISTORY

The prosecution charged Lozano with one count of murder with the use of a deadly weapon, for the death of G.G., one count of attempted murder with the use of a deadly weapon, for shooting at H.G., another count of attempted murder with the use of a deadly weapon, for shooting at Valentine, identified at the time as "John Doe," one count of battery with use of a deadly weapon, for shooting H.G., and one count of possession of a firearm by an ex-felon. (ECF No. 44-6.)

At the first trial, in October and November 2003, the jury found Lozano guilty of first-degree murder with the use of a deadly weapon against G.G. and two counts of attempted murder with the use of a deadly weapon against H.G. and Valentine; the verdict form for the count of battery with a deadly weapon was blank. (ECF No. 44-11.) For the count of murder, the jury sentenced him to death. (ECF No. 44-12.)

Lozano moved for a new trial. (ECF No. 44-14.) The trial court granted the motion. (ECF No. 44-27; ECF No. 44-28.) The prosecution appealed. (ECF No. 44-29.) The

1   Nevada Supreme Court affirmed. (ECF No. 44-34.)

2           The prosecution filed an amended information that replaced "John Doe" with

3   Valentine as the intended victim and deleted the count of possession of a firearm by an

4   ex-felon. (ECF No. 47-2.) At the second trial, the jury found him guilty of first-degree

5   murder with the use of a deadly weapon against G.G., attempted murder with the use of

6   a deadly weapon against H.G, attempted murder with the use of a deadly weapon against

7   Valentine, and battery with a deadly weapon against H.G. (ECF No. 48-4.) After the

8   penalty phase of the trial, the jury set the sentence for first-degree murder at life

9   imprisonment with the possibility of parole. At the sentencing hearing, everyone agreed

10  that the count of battery with a deadly weapon against H.G. was redundant to the count

11  of attempted murder with the use of a deadly weapon against H.G., and the trial court

12  dismissed it. (ECF No. 48-15.) The trial court convicted Lozano on the other three counts.

13  (ECF No. 48-16.) Lozano appealed, and the Nevada Supreme Court affirmed. (ECF No.

14  48-22.)

15          Lozano then filed a post-conviction habeas corpus petition in the state district court.

16  (ECF No. 48-24.) The state district court appointed counsel, who filed a supplement. (ECF

17  No. 48-33.) The state district court then denied the petition. (ECF No. 48-37.) Lozano

18  appealed, and the Nevada Supreme Court affirmed. (ECF No. 48-42.)

19          Lozano then mailed his initial, proper-person habeas corpus petition to the Court.

20  (ECF No. 8.) The initial petition alleged no grounds for relief, and the Court directed

21  Lozano to file an amended petition. (ECF No. 7.) Lozano filed his first amended petition.

22  (ECF No. 13.) The Court appointed counsel. (ECF No. 15.) The Federal Public Defender

23  had a conflict of interest. (ECF No. 17.) The Court appointed substitute counsel, who filed

24  the Petition. (ECF No. 26.) The Court then allowed counsel to withdraw because he had

25  accepted a position as legal counsel for a public entity in another state and he was closing

26  his Nevada law practice. (ECF No. 29.) The Court appointed another substitute counsel,

27  who chose to stand on the Petition. (ECF No. 41.) Respondents filed a motion to dismiss.

28  (ECF No. 43.) The Court granted the motion in part, dismissing parts V and VI of the

1  Petition because they were untimely. (ECF No. 50.) Respondents then filed an answer,

2  and Lozano filed a counseled reply. (ECF Nos. 55, 56.) The Court then allowed Lozano's

3  counsel to withdraw and appointed a third counsel. (ECF No. 59, 60.)

4  **IV.    LEGAL STANDARD**

5      **A.    Standard of review of § 2254 petition**

6          Congress has limited the circumstances in which a federal court can grant relief to

7  a petitioner who is in custody pursuant to a judgment of conviction of a state court.

8          An application for a writ of habeas corpus on behalf of a person in custody
           pursuant to the judgment of a State court shall not be granted with respect
9          to any claim that was adjudicated on the merits in State court proceedings
           unless the adjudication of the claim—
10         (1) resulted in a decision that was contrary to, or involved an unreasonable
           application of, clearly established Federal law, as determined by the
11         Supreme Court of the United States; or
           (2) resulted in a decision that was based on an unreasonable determination
12         of the facts in light of the evidence presented in the State court proceeding.

13  28 U.S.C. § 2254(d). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on

14  the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)."

15  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

16          Federal habeas relief may not be granted for claims subject to § 2254(d)
            unless it is shown that the earlier state court's decision "was contrary to"
17          federal law then clearly established in the holdings of this Court,
            § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); or that it
18          "involved an unreasonable application of" such law, § 2254(d)(1); or that it
            "was based on an unreasonable determination of the facts" in light of the
19          record before the state court, § 2254(d)(2).

20  *Richter*, 562 U.S. at 100. "For purposes of § 2254(d)(1), an unreasonable application of

21  federal law is different from an incorrect application of federal law." *Id.* (citation omitted).

22  "A state court's determination that a claim lacks merit precludes federal habeas relief so

23  long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

24  *Id.* (citation omitted).

25          [E]valuating whether a rule application was unreasonable requires
            considering the rule's specificity. The more general the rule, the more
26          leeway courts have in reaching outcomes in case-by-case determinations.

27  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

28          Under § 2254(d), a habeas court must determine what arguments or

> theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Richter*, 562 U.S. at 102.

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 103.

## B.    Standard for ineffective assistance of counsel

"[T]he right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). A petitioner claiming ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

*Strickland* expressly declines to articulate specific guidelines for attorney performance beyond generalized duties, including the duty of loyalty, the duty to avoid conflicts of interest, the duty to advocate the defendant's cause, and the duty to communicate with the client over the course of the prosecution. *Id.* at 688. The Court avoided defining defense counsel's duties so exhaustively as to give rise to a "checklist for judicial evaluation of attorney performance . . . [a]ny such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id.* at 688-89.

Review of an attorney's performance must be "highly deferential," and must adopt

1  counsel's perspective at the time of the challenged conduct to avoid the "distorting effects

2  of hindsight." *Id.* at 689. A reviewing court must "indulge a strong presumption that

3  counsel's conduct falls within the wide range of reasonable professional assistance; that

4  is, the defendant must overcome the presumption that, under the circumstances, the

5  challenged action might be considered sound trial strategy." *Id.* (citation omitted).

6         The Sixth Amendment does not guarantee effective counsel per se, but rather a

7  fair proceeding with a reliable outcome. *See id.* at 691-92; *see also Jennings v. Woodford*,

8  290 F.3d 1006, 1012 (9th Cir. 2002). Consequently, a demonstration that counsel fell

9  below an objective standard of reasonableness alone is insufficient to warrant a finding of

10 ineffective assistance. The petitioner must also show that the attorney's sub-par

11 performance prejudiced the defense. *Strickland*, 466 U.S. at 691-92. There must be a

12 reasonable probability that, but for the attorney's challenged conduct, the result of the

13 proceeding in question would have been different. *Id.* at 694. "A reasonable probability is

14 a probability sufficient to undermine confidence in the outcome." *Id.*

15        Establishing that a state court's application of Strickland was unreasonable
          under § 2254(d) is all the more difficult. The standards created by Strickland
16        and § 2254(d) are both highly deferential . . ., and when the two apply in
          tandem, review is doubly so . . .. The Strickland standard is a general one,
17        so the range of reasonable applications is substantial. Federal habeas
          courts must guard against the danger of equating unreasonableness under
18        Strickland with unreasonableness under § 2254(d). When § 2254(d)
          applies, the question is not whether counsel's actions were reasonable. The
19        question is whether there is any reasonable argument that counsel satisfied
          Strickland's deferential standard.

20

21 *Richter*, 562 U.S. at 105 (citations omitted).

22 **V.    DISCUSSION**

23        The Petition does not have grounds labeled as such. Instead, parts III through XV

24 each contain a claim for relief.

25        **A.    Part III**

26        Part III of the Petition is a claim that the evidence was insufficient to support the

27 verdict of guilt for first-degree murder. "The Constitution prohibits the criminal conviction

28 of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*,

11

1     443 U.S. 307, 309 (1979) (citing *In re Winship*, 397 U.S. 358 (1970)). "[T]he relevant

2     question is whether, after viewing the evidence in the light most favorable to the

3     prosecution, any rational trier of fact could have found the essential elements of the crime

4     beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). "[T]he

5     standard must be applied with explicit reference to the substantive elements of the criminal

6     offense as defined by state law." *Id.* at 324 n.16. "[A] federal habeas corpus court faced

7     with a record of historical facts that supports conflicting inferences must presume—even

8     if it does not affirmatively appear in the record—that the trier of fact resolved any such

9     conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

10        Because 28 U.S.C. § 2254(d) applies, this Court must be doubly deferential.

11     "Stated another way, to grant relief, we must conclude that the state court's determination

12     that a rational jury could have found that there was sufficient evidence of guilt, i.e., that

13     each required element was proven beyond a reasonable doubt, was objectively

14     unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 965 (9th Cir. 2011). In Nevada, murder

15     is the unlawful killing of a human being with malice aforethought, either express or implied.

16     NRS § 200.010(1). First-degree murder is murder perpetrated by willful, deliberate, and

17     premeditated killing. NRS § 200.030(1)(a).[4]

18        On direct appeal, the Nevada Supreme Court summarily denied this claim. (ECF

19     No. 48-22 at 6.) When the denial on merits is summary, "a habeas court must determine

20     what arguments or theories . . . could have supported the state court's decision; and then

21     it must ask whether it is possible fairminded jurists could disagree that those arguments

22     or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562

23     U.S. at 102.

24        On direct appeal, Lozano presented a flawed argument about the sufficiency of the

25     evidence. First, he argued that Darrian Moten was a questionable witness. Moten originally

26     told the police that Lozano jumped out of the car and fired the shots. Moten then changed

27

28           [4]The statute defines other ways to establish first-degree murder, but this is the theory that the prosecution used in Lozano's case.

his story at trial to blame Vontrell Davis, deceased at the time, as the shooter. (*See* ECF No. 48-19 at 50.) Lozano argued that the jury should not have believed Moten. (*Id.* at 42.) Second, he argued that Robert Valentine, the person at whom Lozano shot but missed, described the person as a "light skinned" or "bright skinned" black person, but Valentine did not identify Lozano. (*Id.* at 41-42.) Third, the gunshot residue evidence was such that both prosecution and defense argued that it was beneficial to their respective positions. (*Id.* at 42.) Fourth, Jonathan Barrales, who witnessed the shooting, could not select Lozano in a photographic lineup and could only say at trial that Lozano looked like the shooter. (*Id.*) Fifth, Erick Barrales, who was Jonathon's brother and who also witnessed the shooting, could not identify Lozano in court and could identify Lozano only in a photographic lineup that Lozano argues was tainted.[5] (*Id.*)

The Respondents' answering argument identified the problem with Lozano's argument—Lozano was highlighting conflicting testimony. However, conflicting testimony is not inadmissible testimony. Instead, the jury is the judge of the credibility of the witnesses and the weight given to their testimonies. (ECF No. 48-20 at 23) (citing *Tabish v. State*, 72 P.3d 584 (Nev. 2003)). As the Court has noted above, if there are conflicting inferences, *Jackson* requires the reviewing court to presume that the jury resolved those conflicts in favor of the prosecution. *Jackson*, 443 U.S. at 326. Lozano presented the claim as if the jury should not have believed any evidence that had conflicts, which in turn would have meant that the jury should have acquitted him. That is not the standard for insufficient evidence. The correct standard is for Lozano to have acknowledged that the jury resolved all those conflicts in favor of the prosecution and then to argue that, even construing all the evidence in the light most favorable to the prosecution, the evidence still was insufficient that Lozano had committed of first-degree murder with the use of a deadly weapon and two counts of attempted murder with the use of a deadly weapon.

At trial, it was not a matter of serious dispute that *somebody* committed acts that

---

[5]The use of the photographic lineup at trial is the subject of part VII, discussed *infra* Section V.D.

1  amounted to first-degree murder with the use of a deadly weapon and two counts of

2  attempted murder with the use of a deadly weapon.[6] The shooter got out of the Ford

3  Taurus, ran around the car, and fired shots at Valentine. That person missed Valentine

4  but hit G.G., killing her, and H.G., seriously wounding her. Lozano does not argue that the

5  evidence was insufficient to establish that the shooter had express malice aforethought

6  and acted with premeditation, deliberation, and willfulness. The shooter was attempting to

7  murder Valentine. Under the doctrine of transferred intent, that person also murdered G.G.

8  and attempted to murder H.G.

9      The main dispute was whether Lozano was the shooter. The Nevada Supreme

10  Court reasonably could have concluded that sufficient evidence existed to support the

11  verdicts that Lozano was guilty. The jury could have resolved all of Moten's conflicting

12  statements in favor of the prosecution, from which the jury could conclude that Lozano

13  exited the car and fired the shots. Both sides argued that the gunshot residue recovered

14  was favorable to their respective positions, but the jury could have concluded that the

15  gunshot residue evidence was favorable to the prosecution. Jonathan Barrales could not

16  pick Lozano out of a photographic lineup, but he did identify Lozano as the shooter in court

17  in 2002, and in the second trial he identified Lozano as the man he identified in 2002. (ECF

18  No. 47-7 at 97-98.) Erick Barrales identified Lozano as the shooter a few hours after the

19  shooting. (ECF No. 47-8 at 22-23.) Although at the second trial Erick could not identify

20  Lozano, sitting at the defense table, as the shooter, he did identify Lozano, as he looked

21  at the time of the shooting in a photographic lineup, as the shooter. (*Id.* at 20-22.)

22      Defense eyewitnesses testified that the shooter was African American. However,

23  that testimony does not cancel out the testimony of the prosecution eyewitnesses. Under

24  *Jackson*, the reviewing court presumes that the jury resolved that conflict in the

25  prosecution's favor. *Jackson*, 443 U.S. at 326.

26

27      [6]Lozano later argued that trial counsel and appellate counsel provided ineffective
    assistance because they did not challenge the validity of the jury instructions defining
28  malice and premeditation. That claim is part XIII of the Petition, and the Court addresses
    it *infra* Section V.J.

14

1      The defense presented evidence that Lozano was left-handed, and all the people

2  who could recall testified that the shooter used his right hand. The defense firearm expert

3  testified that, in his experience, he has never seen a person shoot with the weak hand

4  unless specifically instructed. However, the expert never had observed Lozano himself

5  shooting, and no other evidence was presented on which hand Lozano uses to shoot. The

6  Nevada Supreme Court reasonably could have concluded that even with the evidence of

7  Lozano's left-handedness, a jury could have found him guilty beyond a reasonable doubt.

8      Here, as in the state courts, Lozano argues again that the jury should have resolved

9  the conflicts in testimony and evidence in his favor. Again, Lozano is using a flawed

10  argument. Based upon the evidence presented at trial from the Court's own review of the

11  transcripts, as well as the flawed argument that Lozano presented on direct appeal, the

12  Nevada Supreme Court reasonably could have concluded that the evidence was sufficient

13  for the jury to find Lozano guilty of the crimes.

14      Reasonable jurists would not find the Court's conclusion to be debatable or wrong,

15  and the Court will not issue a certificate of appealability for part III.

16      **B.**    **Part IV**

17      Part IV of the Petition is a claim that trial counsel provided ineffective assistance by

18  opening the door to the prosecution introducing evidence of Lozano's gang affiliation.

19  Defense counsel then asked Baker if she ever knew about or saw for herself any conflict

20  between Lozano and Robert Valentine. (ECF No. 47-12 at 37.) She said no. (*Id.*) In other

21  words, Lozano had no apparent motive to shoot at Valentine. The prosecution argued that

22  this opened the door to introduction of evidence that Lozano and Valentine were members

23  of rival gangs, and the trial court agreed. (*Id.* at 37-54, 155-65.) On this issue, the Nevada

24  Supreme Court held:

25          Fifth, appellant argues that counsel was ineffective for opening the door to
gang evidence by asking questions that implicated appellant's lack of

26          motive to shoot the intended victim. Appellant fails to argue that he was
prejudiced pursuant to *Strickland.* Appellant argues only that, but for

27          counsel's alleged deficiency, the new gang evidence would not have been
introduced at trial. Appellant fails to demonstrate that the outcome of the

28          trial would have been different but for the admission of the new gang

1

2

evidence. We therefore conclude that the district court did not err in denying this claim.

3   (ECF No. 48-42 at 4-5.) The Nevada Supreme Court was right. In the opening brief on

4   post-conviction appeal, Lozano argued for more than three pages how trial counsel

5   performed deficiently by opening the door to gang evidence. (ECF No. 48-39 at 16-20.)

6   Lozano's argument that he was prejudiced—an essential element of a claim of ineffective

7   assistance of counsel—was, in full, "[a]s a result, Mr. Lozano was severely prejudiced."

8   (*Id.* at 14.) The Nevada Supreme Court reasonably concluded that Lozano had not

9   demonstrated a reasonable probability of a different result at trial. A failure to prove

10  prejudice means that a court need not examine whether counsel performed deficiently.

11  *See Strickland*, 466 U.S. at 697. The Nevada Supreme Court thus reasonably determined

12  that counsel did not provide ineffective assistance on this issue.

13         Lozano divided part IV into two parts. Part IV(A) was titled as a claim of ineffective

14  assistance of counsel. Part IV(B) was titled as a claim of trial-court error in admitting gang

15  evidence. In its order granting in part Respondents' motion to dismiss, the Court noted

16  that part IV(B), despite its title, was supporting argument for the claim that trial counsel

17  provided ineffective assistance in opening the door to gang evidence. (ECF No. 50 at 4.)

18  The Court also stated that Respondents need not respond to any perceived claim of trial-

19  court error in part IV(B). (*Id.*) The Court reaffirms that ruling now and will not address part

20  IV(B) as a separate claim for relief.

21         Reasonable jurists would not find this conclusion to be debatable or wrong, and the

22  Court will not issue a certificate of appealability for part IV.

23  **C.     Parts V and VI**

24         The Court dismissed parts V and VI because they were untimely. (ECF No. 50 at

25  5-6.) Reasonable jurists would not find these conclusions to be debatable or wrong. The

26  Court will not issue a certificate of appealability for the dismissals of parts V and VI.

27  **D.     Part VII**

28         Part VII is a claim that the Erick Barrales' in-court photographic identification of

16

1  Lozano made the trial fundamentally unfair, in violation of the Due Process Clause of the

2  Fourteenth Amendment. The Nevada Supreme Court summarily rejected this claim on

3  direct appeal. (ECF No. 48-22, at 6 n.8.)

4      At the second trial, the prosecutor asked Erick if he could see the shooter in the

5  courtroom. (*Id.* at 21.) Erick could not identify the shooter in the courtroom. (*Id.*) Erick then

6  testified that on September 7, 2002, after he gave his statement to the police, the police

7  took him to another location. (*Id.* at 21-22.) At that location, Erick identified the shooter.

8  (*Id.* at 22.) The prosecutor then showed Erick an array of six photographs of men. (*Id.*)

9  Erick selected the photograph of the man he had identified as the shooter on the night of

10  September 7, 2002. (*Id.*) The person that Erick had identified on September 7, 2002, and

11  the person that Erick identified in the photographic lineup at trial, was Lozano.

12      Erick testified on cross-examination about the identification that he had made on

13  the night of September 7, 2002. (*Id.* at 32-33.) Defense counsel did not ask Erick any

14  questions about his in-court photographic identification.

15      During a break in testimony, defense counsel made a record about the

16  identification. He had approached the bench to object to the use of the photographic lineup

17  in trial because Erick never had been shown a photographic lineup before and because

18  the prosecutor was not practiced in administering photographic lineups. (*Id.* at 67.) The

19  trial court found nothing prejudicial in the question posed to Erick or the presentation of

20  the lineup to him. (*Id.* at 73.) The court also noted that Lozano's appearance at trial had

21  changed from his appearance in the photographic lineup. (*Id.*) The prosecutor noted that

22  because Erick could not identify Lozano in the courtroom as the shooter, she showed Erick

23  the photographic lineup that police had shown to his brother Jonathan, and that it would

24  have been more prejudicial to show Erick one photograph and ask if he recognized the

25  person in the photograph. (*Id.*)

26      If the state uses an eyewitness identification procedure that is both suggestive and

27  unnecessary, then the trial court must assess, on a case-by-case basis, whether that

28  identification procedure created a substantial likelihood of misidentification. *Manson v.*

1     *Brathwaite*, 432 U.S. 98 (1977); *Neil v. Biggers*, 409 U.S. 188 (1972). However, if the state

2     does not arrange unnecessarily suggestive circumstances, then the Due Process Clause

3     of the Fourteenth Amendment does not require a preliminary judicial inquiry into the

4     reliability of the eyewitness identification. *Perry v. New Hampshire*, 565 U.S. 228, 248

5     (2012). "When no improper law enforcement activity is involved, we hold, it suffices to test

6     reliability through the rights and opportunities generally designed for that purpose, notably,

7     the presence of counsel at postindictment lineups, vigorous cross-examination, protective

8     rules of evidence, and jury instructions on both the fallibility of eyewitness identification

9     and the requirement that guilt be proved beyond a reasonable doubt." *Id.* at 233.

10          Lozano argues that asking Erick to identify the shooter in a photographic lineup

11    given to him on the witness stand is tantamount to asking Erick to pick the photograph of

12    the defendant out of the lineup. However, the opposite happened. Erick could not identify

13    the defendant sitting at the defense table as the shooter. When the prosecutor showed

14    Erick the photographic lineup, then Erick identified the shooter. That was a photograph of

15    Lozano as he appeared at the time of the shooting, not as he appeared at the time of the

16    trial. If Erick wanted to say that the defendant sitting at the defense table was the shooter,

17    then he simply could have said that the defendant sitting at the defense table was the

18    shooter. Because Erick did not, the Nevada Supreme Court reasonably could have

19    concluded that the in-court presentation of the photographic lineup was not suggestive.

20          As the Supreme Court noted in *Perry*, without a state-created suggestive lineup,

21    the normal procedures for testing reliability apply. First, all this occurred in front of the jury.

22    They had the opportunity to observe Erick's demeanor as he was unable to identify Lozano

23    in court as the shooter but was able to identify Lozano in a photograph as the shooter.

24    Additionally, Lozano had the opportunity to cross-examine Erick about that photographic

25    identification. The jury then would have been able to listen to Erick's answers and, again,

26    observe his demeanor as he answered. As the Court has noted in part III, the jury is the

27    ultimate judge of the credibility of a witness, and Lozano could have tested that credibility.

28    However, Lozano did not question Erick about his identification through the photographic

1   lineup. Nevertheless, the Nevada Supreme Court reasonably could have concluded that

2   the normal procedures for testing the reliability of Erick's identification were sufficient.

3          Reasonable jurists would not find the Court's conclusion on this issue to be

4   debatable or wrong, and the Court will not issue a certificate of appealability for part VII.

5          **E.     Part VIII**

6          Part VIII is a claim that the jury should not have been allowed to use Darrian Moten's

7   out-of-court statement, which he recanted at the second trial, as substantive evidence.

8   Moten told police that Lozano was the shooter. Then, at the second trial, Moten recanted

9   that statement and said that Vontrell Davis, who also was in the car and had since died,

10  was the shooter. The Nevada Supreme Court summarily rejected this claim on direct

11  appeal. (ECF No. 48-22, at 6 n.8.)

12         Part VIII is a near-identical copy of part VI in Lozano's opening brief on direct

13  appeal. (*Compare* ECF No. 26 at 29-31 *with* ECF No. 48-19 at 53-56.) Most of the claim

14  is an argument that the Nevada Supreme Court, as a matter of state law, should restrict

15  the use of prior inconsistent statements as substantive evidence. This argument is not

16  relevant to federal habeas corpus, for which relief may be granted only if Lozano is in

17  custody in violation of the laws or Constitution of the United States. 28 U.S.C. § 2254(a).

18  Lozano concludes part VIII with, "[i]t was a denial of the Sixth Amendment right to confront

19  witnesses and of the Fourteenth Amendment Due Process Right to a fundamentally fair

20  trial to allow use of a prior inconsistent statement[] as substantive evidence." (ECF No. 26

21  at 31.) However, "the Confrontation Clause does not require excluding from evidence the

22  prior statements of a witness who concedes making the statements, and who may be

23  asked to defend or otherwise explain the inconsistency between his prior and his present

24  version of the events in question, thus opening himself to full cross-examination at trial as

25  to both stories." *California v. Green*, 399 U.S. 149, 164 (1970). Moten testified twice, called

26  one time by the prosecution and one time by the defense. Both prosecution and defense

27  questioned Moten extensively about his testimony at trial and his prior statements. The

28  jury was observing Moten's demeanor all throughout his testimony. The Nevada Supreme

1   Court reasonably could have concluded that Moten's testimony satisfied the Confrontation

2   Clause and did not make the trial fundamentally unfair.

3        Reasonable jurists would not find this conclusion to be debatable or wrong, and the

4   Court will not issue a certificate of appealability for part VIII.

5        **F.     Part IX**

6        Part IX is a claim that the prosecution's reference to a prior trial deprived Lozano of

7   a fair trial. On hostile direct examination of Moten about the position of the car in the street,

8   the following occurred:

> Q.     That isn't what you told the police when you gave your statement.
> That's not what you told the last jury, was it? I'm sorry, the last --

10
> A.     That's what I did tell the last jury, though.

11
> THE COURT: The last --

12
> MR. WHIPPLE [defense counsel]: Judge, we need to approach at
13  > this time please.

14  > THE WITNESS: I did.

15  (ECF No. 65-1 at 37-38.) Everybody agreed that the prosecutor's reference to the "last

16  jury," instead of "previous proceedings" or some other phrase that did not indicate a prior

17  jury trial, was inadvertent. The Nevada Supreme Court summarily rejected this claim on

18  direct appeal. (ECF No. 48-22 at 6 n.8.)

19       Lozano cites an Eighth Circuit decision, *United States v. Washington*, 318 F.3d 845,

20  859-60 (8th Cir. 2003), which in turn relies upon *United States v. Davis*, 785 F.2d 610, 618

21  (8th Cir. 1986). Both decisions involved witnesses, on their own, referring to previous trials.

22  In each of these decisions, the Eighth Circuit was acting in its supervisory capacity in an

23  appeal from a criminal trial in federal district court. The decisions do not rely upon the

24  Constitution of the United States or statutes that are applicable to state-court proceedings.

25  Lozano also cites *Hui v. State*, 738 P.2d 892 (Nev. 1987), which involved a juror in Hui's

26  second trial bringing in a newspaper article about Hui's first trial resulting in a conviction.

27  The Nevada Supreme Court's decision, reversing the conviction and remanding for a new

28  trial, was based partly on state law and partly on federal constitutional law, particularly

with regard to juror misconduct. However, in *Hui* the *juror* committed misconduct, bringing in a newspaper article about the case even after being told not to read anything about the case. In Lozano's case, the prosecutor's reference to the last jury was inadvertent. Additionally, as the trial court noted, "the last jury" did not indisputably refer to a prior trial of Lozano in which he was found guilty. (ECF No. 65-1 at 93.) The reference could refer to a grand jury. It also could refer to a jury trial of another person involved in the case. Five people were in the car. Lozano was the defendant in this case. Moten testified under a grant of immunity. Davis was dead. That left two people whom the jury might have thought were charged and tried separately.

The Constitution requires a fair trial, which in turn requires an impartial, indifferent jury. *Murphy v. Florida*, 421 U.S. 794, 799 (1975). This is the standard that Lozano cites. (ECF No. 26 at 32.) It is a general standard, which in turn gives state courts great leeway in applying it. *Yarborough*, 541 U.S. at 664. The Nevada Supreme Court reasonably could have concluded that the prosecutor's inadvertent mention of a prior jury trial and Moten's response, in a second jury trial that took more than a week with many witnesses, were not so prejudicial to make the trial fundamentally unfair.

Reasonable jurists would not find this conclusion to be debatable or wrong, and the Court will not issue a certificate of appealability for part IX.

### G.    Part X

Part X is a claim that trial counsel provided ineffective assistance because trial counsel failed to provide proper notice of an expert witness. Lozano tried to call Dr. T. Kinsora. Dr. Kinsora had performed psychological testing on Lozano. Dr. Kinsora would have testified that Lozano used his left hand during the testing. Lozano also might have tried to introduce the test results into evidence. Counsel did provide notice of Dr. Kinsora in the first trial. Counsel did not provide notice of Dr. Kinsora in the second trial. The trial court thus precluded Dr. Kinsora's testimony. (ECF No. 47-14 at 41-49.) On this issue, the Nevada Supreme Court held:

///

1
2
3
4
5
6
7
8
9

> Second, appellant argues that counsel was ineffective for failing to properly notice the State regarding an expert witness, thereby precluding the witness from testifying as to which hand appellant used while undergoing psychological testing. Appellant fails to demonstrate deficiency or prejudice. Appellant's argument misstates the information counsel was trying to elicit. Appellant was given three psychological tests, the purpose of which was to determine whether he was left- or right-hand dominant. Counsel sought to introduce the results of those tests and not merely the witness's visual observation as to which hand appellant used in taking the tests. Moreover, the jury was presented with evidence that appellant was left-handed through the testimony of his sister, the showing of an older video of appellant in which he was swinging at a pinata using his left hand, and the testimony of a school district nurse that appellant's school records indicate he was left-hand dominant. Accordingly, appellant fails to demonstrate a reasonable probability of a different outcome had counsel been able to call the expert at trial. We therefore conclude that the district court did not err in denying this claim.

10  (ECF No. 48-42, at 3.) As Respondents note, the record supports the factual findings of

11  the Nevada Supreme Court. Monica Delara, Lozano's sister, testified that Lozano is left-

12  handed. (ECF No. 47-14 at 76.) The defense played an old video recording. Delara

13  identified Lozano, then a child, swinging at a pinata left-handed. (*Id.* at 76-77.) Kim Rakow,

14  supervisor of school nurses at the Clark County School District, testified that Lozano's

15  school records show that he was "left-hand dominant." (*Id.* at 85.) Lozano argues that the

16  jury would have been more persuaded by testimony from a doctor. (ECF No. 56 at 7.)

17  However, the two items of documentary evidence showing Lozano as left-handed were

18  created long before Lozano was charged with the crimes in this case. They were insulated

19  from any argument that Lozano fabricated left-handedness. The third piece of evidence,

20  Delara's testimony, came from a person who knew Lozano all his life. The jury had the

21  opportunity to observe her when she answered questions. The Nevada Supreme Court

22  reasonably could have concluded that Lozano had not shown any reasonable probability

23  of a different result had a doctor also testified that Lozano was left-handed.

24       Reasonable jurists would not find the Court's conclusion to be debatable or wrong,

25  and the Court will not issue a certificate of appealability for part X.

26      **H.**    **Part XI**

27       Part XI is a claim of ineffective assistance of counsel because trial counsel failed to

28  investigate properly. Lozano argues that, having opened the door to gang testimony and

1   knowing that the prosecution had plenty of evidence regarding gangs, trial counsel had

2   not investigated that evidence before opening the door. On this issue, the Nevada

3   Supreme Court held:

4       Sixth, appellant argues that counsel was ineffective for failing to properly
        investigate the State's witnesses who were to present the new gang

5       evidence or for not requesting a continuance to allow an investigation.
        Appellant fails to demonstrate deficiency or argue that he was prejudiced.

6       Appellant did notify the court that he may need additional time to investigate,
        but after speaking with the witnesses, he did not request additional time.

7       Further, appellant fails to state what additional investigation would have
        revealed. *See Molina v. State*, 120 Nev. 185, 192, 87 P.3d 533, 538 (2004).

8       Accordingly, appellant fails to demonstrate a reasonable probability of a
        different outcome. We therefore conclude that the district court did not err

9       in denying this claim.

10  (ECF No. 48-42 at 5.) The argument that Lozano presents in part XI is largely the same

11  as the argument that he presented to the Nevada Supreme Court on appeal from the

12  denial of the petition. (*See* ECF No. 48-39 at 20-24.) Although defense counsel did indicate

13  that he might need additional time to investigate, the Nevada Supreme Court was correct

14  that counsel did not request additional time after speaking with the witnesses who testified

15  about Lozano's gang activity. The Nevada Supreme Court also was correct that Lozano

16  did not argue what additional investigation would have revealed, and thus that Lozano had

17  not demonstrated any prejudice. Even now in the amended petition Lozano does not

18  allege any facts that would amount to prejudice. The Nevada Supreme Court reasonably

19  applied *Strickland* to this claim.

20      Reasonable jurists would not find the Court's conclusion to be debatable or wrong,

21  and the Court will not issue a certificate of appealability for part XI.

22      I.      **Part XII**

23      Part XII is a claim of Ineffective assistance of counsel because trial counsel failed

24  to object to, and appellate counsel failed to raise on direct appeal, bench conferences not

25  being recorded. Lozano lists 28 bench conferences that he alleges were not recorded.

26  The list is inaccurate, because the parties did make a record after, at least, Erick Barrales'

27  in-court photographic-lineup identification and after the inadvertent reference to the prior

28  jury trial, as discussed in parts VII and VIII above. On this issue, the Nevada Supreme

1  Court held:

2  > First, appellant argues that counsel was ineffective for failing to ensure that
   > unrecorded bench conferences were put on the record. Appellant fails to

3  > demonstrate deficiency or prejudice. Appellant did not specify the subject

4  > matter of the listed bench conferences or explain their significance, *see*
   > *Daniel v. State*, 119 Nev. 498, 508, 78 P.3d 890, 897 (2003), and thus fails

5  > to support this claim with specific facts that, if true, would entitle him to relief.
   > We therefore conclude that the district court did not err in denying this claim.

6  (ECF No. 48-42 at 3.) The argument that Lozano presents in part XIII is largely the same

7  as the argument that he presented to the Nevada Supreme Court on appeal from the

8  denial of the petition. (*See* ECF No. 48-39 at 24-36.) Lozano listed 28 instances of

9  unrecorded bench conferences without any indication of what the subject matter of each

10 conference was. *Daniel v. State*, 78 P.3d 890 (Nev. 2003), which Lozano cites in his

11 petition and state-court appellate brief and which the Nevada Supreme Court itself cited

12 in its order of affirmance, quoted above, states that Lozano must demonstrate that the

13 subject matter of the unrecorded bench conference was so significant that the reviewing

14 court "cannot meaningfully review an appellant's contentions of error and the prejudicial

15 effect of any error." *Daniel*, 78 P.3d at 897. A list of bench conferences does not meet that

16 standard. The Nevada Supreme Court reasonably concluded that Lozano had not

17 demonstrated either deficient performance or prejudice.

18 Reasonable jurists would not find the Court's conclusion to be debatable or wrong,

19 and the Court will not issue a certificate of appealability for part XII.

20 **J.     Part XIII**

21 Part XIII contains claims of ineffective assistance of counsel regarding the lack of

22 objection to three jury instructions.

23 **1.     Part XIII(A)**

24 In part XIII(A), Lozano claims that trial counsel failed to object to—and appellate

25 counsel failed to raise on direct appeal—instruction 7, defining malice, which states:

26 > Express malice is that deliberate intention unlawfully to take away the life of
   > a human being, which is manifested by external circumstances capable of

27 > proof.

28 > Malice may be implied when no considerable provocation appears, or when

24

1    all the circumstances of the killing show an *abandoned and malignant heart*.

2    (ECF No. 48-3 at 9 (emphasis added).) Lozano argues that the phrase "abandoned and

3    malignant heart" is archaic, and unconstitutionally vague and ambiguous. On this issue,

4    the Nevada Supreme Court held:

5            Third, appellant argues that counsel was ineffective for failing to object to
     the jury instruction on malice because the terms "abandoned or malignant
6            heart" are meaningless. Appellant fails to demonstrate deficiency or
     prejudice. Appellant fails to identify what instruction should have been
7            given, and this court considered and rejected a similar argument in *Leonard
     v. State*, 117 Nev. 53, 78-79, 17 P.3d 397, 413 (2001). Accordingly,
8            appellant fails to demonstrate a reasonable probability of a different
     outcome had counsel objected to the malice instruction. We therefore
9            conclude that the district court did not err in denying this claim.

10   (ECF No. 48-42 at 3-4.) The Nevada Supreme Court rejected the claim of ineffective

11   assistance of appellate counsel for the same reasons. (*Id.* at 5.) In *Leonard v. State*, 17

12   P.3d 397 (Nev. 2001), cited in the decision quoted above, the Nevada Supreme Court

13   noted, "[a]bsent some indication that the jury was confused by the malice instructions

14   (including the instruction on malice aforethought and express malice), a defendant's claim

15   that the instructions were confusing is merely speculative." *Id.* at 413 (citation omitted).

16   The Court has read Lozano's argument on post-conviction appeal. (ECF No. 28-29.)

17   Lozano did not present any indication that the malice instruction confused the jury. The

18   Nevada Supreme Court thus reasonably determined that Lozano had not shown deficient

19   performance or prejudice.

20         Reasonable jurists would not find this conclusion to be debatable or wrong, and the

21   Court will not issue a certificate of appealability for part XIII(A).

22         **2.      Part XIII(B)**

23         In part XIII(B), Lozano claims that trial counsel failed to object to—and appellate

24   counsel failed to raise on direct appeal—instruction 8's definition of premeditation, which

25   states:

26         Premeditation is a design, a determination to kill, distinctly formed in the
     mind by the time of the killing.

27
     Premeditation need not be for a day, an hour, or even a minute. It may be
28         as instantaneous as successive thoughts of the mind. For if the jury believes

from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the act follows the premeditation, it is premeditated.

(ECF No. 48-3 at 10.) On this issue, the Nevada Supreme Court held:

Fourth, appellant argues that counsel was ineffective for failing to object to the jury instruction on premeditation and deliberation. Appellant fails to demonstrate deficiency or prejudice. Appellant fails to identify what instruction should have been given, and the instruction that was given was approved by this court in *Byford v. State*, 116 Nev. 215, 236-37, 994 P.2d 700, 714 (2000). Further, there was clearly sufficient evidence to establish that appellant acted with deliberation and premeditation. *See id.* at 233, 994 P.2d at 712. The vehicle stopped near the intended victim, appellant exited the passenger side, walked around the vehicle to the side the intended victim was on, and fired several shots as the intended victim fled. The jury also heard that one of the vehicle's occupants had previously testified that, after the vehicle stopped, appellant said, "I'm going to get at this dude" and exited the vehicle. Accordingly, appellant fails to demonstrate a reasonable probability of a different outcome had counsel objected to the instruction on premeditation and deliberation. We therefore conclude that the district court did not err in denying this claim.

(ECF No. 48-42 at 4.) The Nevada Supreme Court rejected the claim of ineffective assistance of appellate counsel for the same reasons. (*Id.* at 5.) As with part XIII(A), Lozano's brief on the post-conviction appeal did not argue what instruction should have been given. (ECF No. 48-39 at 29-30.) The Nevada Supreme Court thus reasonably determined that Lozano had failed to demonstrate deficient performance. The Nevada Supreme Court's summary of the sufficiency of the evidence, which itself this Court has determined was reasonable, thus shows that it reasonably determined that Lozano failed to demonstrate prejudice.

Reasonable jurists would not find this Court's determination to be debatable or wrong, and the Court will not issue a certificate of appealability for part XIII(B).

### 3.    Part XIII(C)

Part XIII(C) is a claim that appellate counsel should have raised the issue of the instruction defining reasonable doubt on direct appeal. (*See* ECF No. 48-3 at 26.) The Nevada Supreme Court held that this instruction was required by statute and was constitutional. (ECF No. 48-42 at 6.) The Ninth Circuit has held that Nevada's reasonable-doubt instruction is constitutional. *Ramirez v. Hatcher*, 136 F.3d 1209, 1211-15 (9th Cir.

26

1
2
3
4

1998). The Ninth Circuit also has held that the issue is not worthy of a certificate of appealability. *Nevius v. McDaniel*, 218 F.3d 940, 944-45 (9th Cir. 2000). The Nevada Supreme Court reasonably concluded that appellate counsel did not perform deficiently, and that Lozano did not suffer prejudice.

5
6

Reasonable jurists would not find this conclusion to be debatable or wrong, and the Court will not issue a certificate of appealability for part XIII(C).

7

**K.** **Part XIV**

8
9
10
11
12
13
14
15
16
17
18
19
20

Part XIV is a claim that appellate counsel provided ineffective assistance because appellate counsel did not raise jury tampering or bias on direct appeal. The trial court questioned a female juror about an incident that had occurred. (ECF No. 47-14 at 16.) At a break in proceedings, a man approached the juror. The man asked the juror for her phone number. *Id.* She told him that she was on a jury and that she did not know with whom she could talk. *Id.* She did not give her phone number to him. *Id.* Two other jurors witnessed the interaction, but they did not intervene. (*Id.* at 16.) After the incident, those two jurors asked the female juror what had happened, and she told them. (*Id.*) The juror said that she did not know who the man was and did not recognize him. (*Id.*) The trial court asked her if the incident would affect her ability to be completely fair and impartial in the case. (*Id.*) The juror said, "No. I don't deal with clowns." (*Id.*) The trial court gave the prosecution and the defense the opportunity to ask questions. (*Id.*) Both declined. (*Id.*) The trial then resumed.

21
22
23
24
25
26
27

The man who asked for the phone number was Robert Waddell. Waddell drove the Ford Taurus at the time of the shooting. (*See* (ECF No. 65-1 at 24.) Waddell did not testify at this trial. Before the incident with the juror, Waddell's prior testimony was read to the jury. (ECF No. 66-1 at 78-81, 86-94.) During the read-back, a photograph of Waddell was admitted into evidence and shown to the jury. (*Id.* at 85-86.) Before questioning the juror, the trial court noted that Waddell's photograph had been shown to the jury. (ECF No. 47-14 at 9.)

28

Later, during the prosecution's closing argument, the juror recognized that the man

1
2
3

who approached her was one of the people in the car. She made it clear that her recognition did not affect her judgment. Both parties and the trial court were satisfied with her explanation, and argument continued. (ECF No. 48 at 53.)

4
5
6

Appellate counsel did not raise this issue on direct appeal. In his state post-conviction habeas corpus proceedings, Lozano argued that appellate counsel thus provided ineffective assistance. On this issue, the Nevada Supreme Court held:

7
8
9
10
11

> Third, appellant argues that counsel was ineffective for failing to raise jury tampering and/or bias. Appellant fails to demonstrate deficiency or prejudice. Appellant failed to allege any facts that indicated the juror engaged in conduct contrary to her oath or that the person who spoke with the juror attempted to influence the jury process, *see Meyer v. State*, 119 Nev. 554, 561, 80 P.3d 447, 453 (2003), and thus fails to support his claim with specific facts that, if true, would entitle him to relief. We therefore conclude that the district court did not err in denying this claim.

12
13
14
15
16
17
18
19

(ECF No. 48-42 at 6.) The record supports the Nevada Supreme Court's findings. The juror said that she denied Waddell's request and that the incident would not affect her. The juror also said that the two other jurors watched but were not involved in the incident. Trial counsel, the prosecutor, and the trial court were satisfied with those responses that Waddell did not try to influence the jury. Even after the juror recognized who the man was, she still said that it would not affect her judgment, and everyone was satisfied with that. The Nevada Supreme Court reasonably concluded that, if appellate counsel had raised the issue on appeal, there would have been no reasonable probability of success.

20
21

Reasonable jurists would not find the Court's determination to be debatable or wrong, and the Court will not issue a certificate of appealability for part XIV.

22

**L.    Part XV**

23
24

Part XV is a claim that the cumulative errors of counsel amounted to ineffective assistance. On this issue, the Nevada Supreme Court held:

25
26
27
28

> Finally, appellant claims that he "received ineffective assistance of counsel based upon cumulative error." Appellant cited this court's standard of direct review for cumulative-error analysis, *see Big Pond v. State*, 101 Nev. 1, 3, 692 P.2d 1288, 1289 (1985), but provided no argument or analysis to support his claim, *see Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987). We therefore conclude that the district court did not err in denying this claim.

(ECF No. 48-42 at 7.) The Nevada Supreme Court was correct. Lozano did not provide any argument or analysis in support of the cumulative-error claim. (*See* Ex. 190 at 28.) The Nevada Supreme Court thus reasonably determined that Lozano had failed to demonstrate that he was entitled to relief because of cumulative error.

Reasonable jurists would not find the Court's conclusion to be debatable or wrong, and the Court will not issue a certificate of appealability.

## VI.  CONCLUSION

It is therefore ordered that the second amended petition for a writ of habeas corpus (ECF No. 26) is denied. The Clerk of the Court is directed to enter judgment accordingly and to close this action.

It is further ordered that a certificate of appealability will not issue.

DATED THIS 25th day of June 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE